FILED
Aug 28, 2020
02:28 PM(CT)
TENNESSEE COURT OF
WORKERS' COMPENSATION
CLAIMS



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT MURFREESBORO

| | | |
|---|---|---|
| ANGEL SMITH,<br>　　　　Employee, | ) | Docket No 2018-05-1098 |
| v. | ) | |
| TRUSTPOINT HOSPITAL, LLC,<br>　　　　Employer, | ) | State File No. 894-2018 |
| And | ) | |
| ACE AMERICAN INS. CO.,<br>　　　　Carrier | ) | Judge Robert Durham |
| And | ) | |
| ABIGAIL HUDGENS,<br>ADMINITRATOR, TENNESSEE<br>SUBSEQUENT INJURY FUND | ) | |

---

## EXPEDITED HEARING ORDER
## GRANTING BENEFITS

---

This case came before the Court on August 19, 2020, for an Expedited Hearing. Ms. Smith seeks additional surgery to her left shoulder as recommended by her authorized physician as well as additional temporary disability benefits.[1] The Court holds that Ms. Smith provided enough evidence to establish she is likely to prove the causal relation of the surgery to her work injury as well as its reasonableness. Thus, the Court orders the requested benefits.

### History of Claim

Ms. Smith began her employment as a certified nursing assistant for Trustpoint Hospital in 2015. She testified that on December 31, 2017, she felt a "pop" and intense pain in her left shoulder while lifting a catatonic patient's leg. Ms. Smith immediately reported the incident, noting on Trustpoint's "Occurrence Report" that she underwent

---

[1]Ms. Smith deferred the issue of attorney's fees.

1

surgery in 2010 for her left rotator cuff.[2] She went to the emergency room, and the doctor recommended an orthopedic referral for a possible rotator cuff tear.

Trustpoint provided a panel of doctors, and Ms. Smith saw Dr. Frank Thomas on January 2, 2018. Her history remained consistent. In addition, she told him that she did not suffer from any problems with her shoulder before the incident. Dr. Thomas prescribed steroids and ordered physical therapy. Ms. Smith asserted the therapy aggravated her symptoms. Dr. Thomas then ordered an MRI. The report noted "rotator cuff tendinosis/tendinopathy with minimal partial-thickness articular and bursal surface tears." After reviewing the MRI and seeing Ms. Smith's lack of progress, Dr. Thomas referred her to a shoulder specialist.

Trustpoint provided another panel, and Ms. Smith chose orthopedist Kyle Joyner, whom she first saw in February 2018.[3] Her history indicated that she underwent left shoulder surgery some years earlier.[4] After examining Ms. Smith and reviewing her MRI, Dr. Joyner felt she had some arthritic changes at the acromioclavicular (AC) joint and a significant rotator cuff injury. He diagnosed an aggravation of her AC joint and underlying impingement. He injected her shoulder, placed significant work restrictions, and recommended additional therapy for a month.[5]

On her return, Ms. Smith claimed conservative treatment had not improved her pain. Based on her history and the MRI, Dr. Joyner diagnosed impingement, AC joint arthritis and a partial-thickness rotator cuff tear and recommended arthroscopic surgery. After receiving authorization, he arthroscopically relieved the impingement syndrome and debrided superficial tears in the cuff. Dr. Joyner testified that the surgery confirmed his pre-operative diagnoses. The operative report specifically mentioned finding a "low-grade partial thickness tear" in the rotator cuff.

After surgery, Ms. Smith underwent physical therapy, a home exercise program, and an injection of pain medicine, but she continued to complain of significant pain, especially with motion. Dr. Joyner prescribed anti-inflammatories and muscle relaxants and ordered another MRI that revealed inflammatory changes around the AC joint. He treated with injections of anti-inflammatories and steroids and a continuation of her home exercise program. However, despite conservative treatment, Ms. Smith's pain remained unchanged. Dr. Joyner recommended an "open decompression of the AC joint with a

---

[2] The surgery was actually in 2012.

[3] The Court gleaned the history from Dr. Joyner's deposition.

[4] Ms. Smith testified that she could not recall any treatment for her left shoulder before 2012; however, Trustpoint submitted medical records to impeach this statement. Given that this apparent treatment occurred several years ago and occurred before her first surgery, the Court gives the records little weight when assessing Ms. Smith's credibility.

[5] Ms. Smith did not complete the scheduled therapy due to pain complaints but instead engaged in a home exercise program.

possible interposition," which he described as the "definitive treatment" if arthroscopic debridement and excision does not provide relief.

Trustpoint sent the recommendation through Utilization Review. The reviewer noted severe AC arthritis with inflammation as well as bursitis and indications of clinical impingement. Nevertheless, he refused to approve the surgery based on "limited objective findings" and a failure to "exhaust all indicated conservative care."

Following the refusal, Dr. Joyner injected Lidocaine into Ms. Smith's shoulder as an additional diagnostic tool. Based on the result, he appealed the UR decision. The Bureau's Assistant Medical Director, Dr. James Talmage, agreed with the denial, but he suggested that Dr. Joyner send the recommendation back to UR with documentation of any active rheumatologic disease, a re-examination after local anesthetic injection, and documentation of psychiatric care.

Dr. Joyner did not resubmit the request to UR. Instead, he sent Ms. Smith for a Functional Capacity Evaluation to ascertain physical restrictions, since he felt she was at maximum medical improvement if she did not undergo surgery. According to the FCE, Ms. Smith gave good, consistent effort, and the evaluator recommended substantial physical restrictions, which Dr. Joyner adopted.

Ms. Smith stated without contradiction that she could not return to work at Trustpoint, given her physical restrictions and limitations. She testified to intense pain in her left shoulder, particularly when attempting to lift, carry or reach out or behind with her left arm. She demonstrated that she cannot lift her left arm to ninety degrees. She further testified that she has not worked anywhere since Dr. Joyner stated she was at MMI, although she has sold various products online.

The parties also submitted evidence about Ms. Smith's previous problems with her left shoulder. Records from Dr. Mitchell Willoughby note that in 2012, he saw Ms. Smith for pain and limited motion in her left shoulder. An MRI revealed a significant rotator cuff tear as well as AC impingement of the rotator cuff. That same year, Dr. Wayne Mosley performed arthroscopic surgery and noted that he saw fraying on the labrum and both sides of the cuff but not a full-thickness rotator cuff tear. He debrided the labrum fraying and decompressed the AC joint.

Ms. Smith stated that after the 2012 surgery, she returned to work as a CNA without limitations and she did not suffer from any pain or restrictions until the December 2017 incident. Trustpoint offered no evidence in rebuttal.

Ms. Smith also introduced Dr. Joyner's deposition. He gave his opinion that on December 31, 2017, Ms. Smith suffered a new work injury that was primarily related to her employment. Dr. Joyner testified that, based on Ms. Smith's history, complaints,

3

examinations and tests, the primary cause of her need for additional surgery was this work incident, in that it caused an exacerbation of her pre-existing AC arthritis as well as a low-grade rotator cuff tear. On cross-examination, he reiterated that Ms. Smith likely experienced an anatomic change in her left shoulder, given her symptoms and the intraoperative findings of a low-grade, partial-thickness rotator cuff tear. He also believed the increased inflammation noted on the post-surgical MRI suggested an exacerbation of her pre-existing arthritis.

Dr. Joyner further testified that he and Ms. Smith complied with the recommendations made by the UR evaluator and Dr. Talmage after they denied surgery. Ms. Smith had multiple courses of physical therapy; her physical findings were positive; she was treated with anti-inflammatories and steroids; she underwent a Lidocaine test; and her MRI confirmed residual pathological changes at the AC joint. The only recommendation not followed was a psychological evaluation, which he did not believe was warranted. He maintained that an open decompression of the AC joint was still reasonable and necessary and stood by that opinion on cross-examination.

He also felt that the restrictions he adopted from the FCE were reasonable and related to her work injury. Further, he only placed Ms. Smith at MMI because she could not have surgery. If he were allowed to do surgery, she would not be at MMI until she recovered.

To counter Dr. Joyner's opinions, Trustpoint offered the deposition of Dr. Damon Petty, an orthopedist who performed an independent medical evaluation. Dr. Petty testified that he and Dr. Joyner have similar expertise and experience in treating shoulders. Regarding the reasonableness and necessity of Dr. Joyner's proposed surgery, he concluded: "I think that's a great plan. I think it is what she appears to need. I think he's taking her situation and assessing it with a reasonable and appropriate treatment plan."

As to causation, Dr. Petty believed that, while Ms. Smith suffered a work-related injury in 2017, it only caused an aggravation of her pre-existing AC arthritis because the operation did not reveal a rotator cuff tear that required repair. Based on the operative report, he disagreed that Ms. Smith suffered a "low-grade rotator cuff tear." He also felt that Ms. Smith's current symptoms and need for surgery stem from her pre-existing, non-work-related AC arthritis. The only exception he cited was if her pain and limitations are due to adhesive capsulitis that arose after surgery; however, given her inconsistent results and what he felt was symptom magnification when testing motion, he did not believe that to be the case. Finally, he agreed that adopting the FCE restrictions was an acceptable way for Dr. Joyner to assign physical restrictions.

On the issue of temporary disability benefits, the parties agreed to a compensation rate of $417.40, and Trustpoint overpaid Ms. Smith $8,592.32 in temporary disability benefits. Trustpoint stopped paying temporary disability benefits on April 2, 2019.

## Findings of Fact and Conclusions of Law

At this Expedited Hearing, Ms. Smith must come forward with sufficient evidence from which this Court can determine that she is likely to prevail at trial in establishing that she sustained a left shoulder injury in 2017 that arose primarily out of and in the course and scope of her employment. She must also establish the likelihood that an additional surgery is reasonable and necessary to treat this injury. *McCord v. Advantage Human Resourcing*, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *9 (Mar. 27, 2015).

Ms. Smith must first prove that her left shoulder injury arose primarily out of and in the course and scope of her employment. Tenn. Code Ann. § 50-6-102(14)(A). Ms. Smith's uncontroverted testimony was that, while she had arthroscopic surgery on her left shoulder in 2012, she was asymptomatic and without limitations until the 2017 incident. Dr. Joyner, as the authorized physician, gave his opinion that Ms. Smith's injury arose primarily from the 2017 incident, and his opinion on causation is presumed correct. Tenn. Code Ann. § 50-6-102(14)(E). Finally, while he disputed the nature of the injury, Dr. Petty also testified that he believed Ms. Smith suffered a work-related injury to her left shoulder. Thus, the Court holds that Ms. Smith is likely to prove she suffered a compensable, left-shoulder injury on December 31, 2017.

The Court now moves on to the more contested issue of whether Trustpoint must authorize additional surgery for Ms. Smith. Trustpoint argues against it, based on both causation and reasonable necessity, which the Court shall address in turn.

Dr. Joyner unequivocally testified that Ms. Smith requires an open decompression of the AC joint, and that this need is primarily related to her work injury. He stated that while she unquestionably had pre-existing AC arthritis, her injury and later surgery caused an exacerbation of this condition. As evidence, he noted the fraying of the rotator cuff, which he described as a "low-grade tear" in his operative report and his deposition. He also noted the significant inflammation surrounding the AC joint. Given Ms. Smith's asymptomatic history since 2012, as well as her clinical findings, he concluded the December 2017 incident caused Ms. Smith's current debilitating condition. Again, this opinion is presumed correct.

Dr. Petty's opinion differs from Dr. Joyner. He believed Ms. Smith's current complaints stem from her pre-existing arthritis and are not causally related to her work injury, with the possible exception of adhesive capsulitis due to surgery. His disagreement centered on whether Ms. Smith suffered a rotator cuff tear. He believed she did not, based on the operative report, even though Dr. Joyner specifically described it in the report. The Court finds that the disagreement lies in how Dr. Petty and Dr. Joyner define the rotator cuff's condition. Dr. Joyner felt that the fraying constituted a "low-grade tear," and therefore constituted evidence of an acute injury. Dr. Petty did not consider the fraying to

5

be a tear or evidence of an acute injury to the rotator cuff.

When confronted with conflicting opinions, the Court has discretion to determine which opinion to accept. *Patterson v. Huff & Puff Trucking*, 2018 TN. Wrk. Comp. Bd. LEXIS 33, at *9 (July 6, 2018). When doing so, the Court may consider, among other things, "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information by other experts." *Bass v. The Home Depot U.S.A, Inc.*, 2017 TN Wrk. Comp. App. Bd. LEXIS 36, at *9 (May 26, 2017).

Here, the doctors are equals in expertise and experience; however, Dr. Joyner examined Ms. Smith on multiple occasions for over a year. The fact that there is no evidence that Ms. Smith was symptomatic before the incident also gives weight to Dr. Joyner's opinion that the incident exacerbated her condition. In addition, he had an opportunity to visually inspect Ms. Smith's AC joint and rotator cuff, while Dr. Petty did not. Finally, Dr. Joyner is entitled to a presumption of correctness as the treating physician. Given these factors, the Court holds that Ms. Smith has established the likelihood of proving that her need for surgery is causally related to her work injury.

As for the reasonableness and necessity of surgery, Dr. Joyner and Dr. Petty agreed that surgery is a reasonable and appropriate course of treatment. The only contrary evidence is the non-certification from Utilization Review and Dr. Talmage's report affirming the denial. However, as Dr. Joyner pointed out, he complied with their suggestions except for a psychiatric consult, which he did not believe appropriate. Under the circumstances, the Court has little trouble holding that the proof establishes that the recommended surgery is reasonable and necessary.

Finally, Ms. Smith is entitled to temporary disability benefits if she was temporarily disabled from employment due to a work-related injury. *See Shepherd v. Haren Const. Co., Inc.*, 2016 TN Wrk. Comp. App. Bd. LEXIS 15, at *13 (Mar. 30, 2016). Here, the undisputed testimony is that Dr. Joyner placed Ms. Smith under restrictions that prevented her from working at Trustpoint. He also testified that he only placed her at maximum medical improvement because he could not treat her further through surgery, and she would not be at MMI if the Court orders surgery. Under the circumstances, the Court finds that Ms. Smith is likely to prove that she is not yet at MMI and that she cannot return to work for Trustpoint. Thus, Trustpoint shall pay temporary disability benefits, less credit for previous overpayment, from April 2, 2019, through the date she reaches MMI from her surgery.

IT IS, THEREFORE, ORDERED THAT:

1. Trustpoint shall authorize Dr. Joyner to provide additional treatment to Ms. Smith for her left shoulder injury including, but not limited to, an open

6

decompression of the AC joint.

2. Trustpoint shall pay Ms. Smith temporary disability benefits at a compensation rate of $417.40 from April 2, 2019, through August 26, 2020, less a credit of $8,592.32 in overpayment of previous benefits for a total of $21,997.14. Trustpoint shall continue paying temporary disability benefits until Ms. Smith reaches maximum medical improvement or is able to return to work.

3. This case is set for a Scheduling Hearing on **Wednesday, October 14, 2020, at 10:00 a.m. Central Time**. The parties must call 615-253-0010 to participate. Failure to appear might result in a determination of the issues without the party's participation.

4. Unless interlocutory appeal of the Expedited Hearing Order is filed, compliance with this Order must occur no later than seven business days from the date of entry of this Order as required by Tennessee Code Annotated section 50-6-239(d)(3). The Insurer or Self-Insured Employer must submit confirmation of compliance with this Order to the Bureau by email to WCCompliance.Program@tn.gov no later than the seventh business day after entry of this Order. Failure to submit the necessary confirmation within the period of compliance might result in a penalty assessment for non-compliance. For questions regarding compliance, please contact the Workers' Compensation Compliance Unit via email at WCCompliance.Program@tn.gov.

**ENTERED on August 28, 2020.**

**ROBERT DURHAM, JUDGE**
**Court of Workers' Compensation Claims**

**APPENDIX**

Technical Record:
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Expedited Hearing
4. Trustpoint's Witness and Exhibit List
5. Ms. Smith's Witness and Exhibit List
6. Trustpoint's Pre-Hearing Brief
7. Ms. Smith's Pre-Hearing Brief

8. Subsequent Injury Fund's Pre-Hearing Brief

Exhibits:

1. Agreed Compilation of Exhibits
2. Dr. Petty's deposition with exhibits
3. Dr. Naylor's deposition with exhibits
4. Medical records offered for impeachment

## CERTIFICATE OF SERVICE

I certify that a copy of the Order was sent as indicated on August 28, 2020.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|---|---|---|---|---|
| R. Steven Waldron | | | X | arlenesmith@wfptnlaw.com |
| Marcia McShane | | | X | mmcshane@constangy.com |
| Ron McNutt | | | X | Ronald.mcnutt@tn.gov |

PENNY SHRUM, Court Clerk
WC.CourtClerk@tn.gov



<u>Expedited Hearing Order Right to Appeal</u>:

If you disagree with this Expedited Hearing Order, you may appeal to the Workers' Compensation Appeals Board. To appeal an expedited hearing order, you must:

1. Complete the enclosed form entitled: "Notice of Appeal," and file the form with the Clerk of the Court of Workers' Compensation Claims *within seven business days* of the date the expedited hearing order was filed. When filing the Notice of Appeal, you must serve a copy upon all parties.

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing of the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of the appeal.**

3. You bear the responsibility of ensuring a complete record on appeal. You may request from the court clerk the audio recording of the hearing for a $25.00 fee. If a transcript of the proceedings is to be filed, a licensed court reporter must prepare the transcript and file it with the court clerk *within ten business days* of the filing the Notice of Appeal. Alternatively, you may file a statement of the evidence prepared jointly by both parties *within ten business days* of the filing of the Notice of Appeal. The statement of the evidence must convey a complete and accurate account of the hearing. The Workers' Compensation Judge must approve the statement before the record is submitted to the Appeals Board. If the Appeals Board is called upon to review testimony or other proof concerning factual matters, the absence of a transcript or statement of the evidence can be a significant obstacle to meaningful appellate review.

4. If you wish to file a position statement, you must file it with the court clerk within *ten business days* after the deadline to file a transcript or statement of the evidence. The party opposing the appeal may file a response with the court clerk *within ten business days* after you file your position statement. All position statements should include: (1) a statement summarizing the facts of the case from the evidence admitted during the expedited hearing; (2) a statement summarizing the disposition of the case as a result of the expedited hearing; (3) a statement of the issue(s) presented for review; and (4) an argument, citing appropriate statutes, case law, or other authority.

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



## NOTICE OF APPEAL
Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

Docket No.: _____

State File No.: _____

Date of Injury: _____

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies). Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____    ☐ Motion Order filed on _____

☐ Compensation Order filed on _____    ☐ Other Order filed on _____

issued by Judge _____ .

### Statement of the Issues on Appeal

Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

_____

### Parties

**Appellant(s)** (Requesting Party): _____ ☐ Employer ☐ Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐ Employer ☐ Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

## CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 ____.

_____
*[Signature of appellant or attorney for appellant]*